Felix Oil Company, a corporation, v. Commissioner.
Felix Oil Co. v. Commissioner
Docket No. 107148.
United States Tax Court
1942 Tax Ct. Memo LEXIS 31; 1 T.C.M. (CCH) 249; T.C.M. (RIA) 42662; 12/18/1942
*31 Paul S. Marrin, Esq., 1000 Balfour Bldg., San Francisco, Calif., for the petitioner. John H. Pigg, Esq., for the respondent. ARNOLD Memorandum Opinion ARNOLD, J.: This proceeding involves income tax deficiencies for 1937, 1938 and 1939 in the respective amounts of $21,428.28, $15,571.32 and $12,958.74, and an excess profits tax deficiency for 1937 in the amount of $212,87. Petitioner alleges that it has overpaid its income taxes for the respective taxable years by the sum of $3,035.12, $3,382.96 and $2,045.30. The issue to be decided is the amount of percentage depletion, if any, to which petitioner is entitled for each of the taxable years. A decision thereof depends upon (1) whether a written agreement between petitioner and Petroleum Securities Co., dated December 7, 1928, is an indenture of lease or a sale of the oil underlying the property, and (2) whether petitioner should compute its depletion deduction, if entitled thereto, upon one-half of the gross income from the property covered by the indenture, or upon one-half of said gross income reduced by certain costs, charges and expenses, as specified in the agreement. [The Facts] The facts were stipulated. We adopt the *32 stipulated facts as our findings of fact which are hereinafter summarized. Petitioner, a California corporation, made its returns for the taxable years to the collector for the first district of California. On December 7, 1928, petitioner owned certain tracts or parcels of land containing 160 acres, more or less, situated in Kings County, California, in what is known as the Kettleman Hills District. On the latter date petitioner entered into a written agreement with Petroleum Securities Co., a California corporation, which has been in full force and effect since the execution thereof. On or about November 1, 1938, Petroleum Securities Co. transferred or assigned all its rights and interests under said agreement to its stockholders, who, since that date, have operated the properties through their agent, Robert S. Lytle. Any reference herein to Petroleum Securities Co. will include its assignees aforementioned and their operating agent. After naming petitioner as lessor and Petroleum Securities Co. as lessee, the agreement provides that in consideration of the sum of $10.00 this day paid to the lessor by the lessee and the covenants and agreements of the lessee, the lessor "hereby *33 leases and demises" to the lessee the 160 acres aforementioned. TO HAVE AND TO HOLD unto the Lessee for the term of twenty (20) years from the date hereof, and so long thereafter as oil, petroleum, natural gas or kindred substances or any one or more of them shall be produced from said land. And the Lessor hereby grants to the Lessee for and during the full term hereof the sole and exclusive right and privilege to explore for, discover, produce, extract, treat, refine, transport, sell and otherwise dispose of for its own use and benefit, all petroleum, natural gas and other hydro-carbon substances, in, under and upon said tracts of land, or any part thereof, * * *. In addition to the right to explore, the lessee was granted a right of entry for drilling and operating, the right to drill, construct, operate and maintain wells, storage facilities, and equipment, and the right to develop and use any and all water on or under the land in connection with lessee's operations thereon. Petitioner, as lessor, covenanted that it was the owner in fee simple of the land demised, that the land was free and clear of all liens and encumbrances except the second installment of taxes for the fiscal *34 year 1928-1929; that it warranted and agreed to defend the title and possession of lessee "in and to the lands hereby leased"; that it would permit the lessee upon expiration of the term, "or any sooner termination of this lease, whether by surrender, abandonment, forfeiture, re-entry or otherwise" to remove all fixtures and improvements, provided the lessee paid the lessor within 30 days after the removal of 50 percent of the reasonable salvage value or 50 percent of the actual price received from the sale of the fixtures and improvements so removed, the cost of which had been fully reimbursed to the lessee under the provisions of the agreement; and provided further that petitioner could purchase the casing in any well producing usable water under certain conditions here immaterial; and finally that lessor will pay any and all taxes levied or assessed upon the lands hereby leased or the improvements except such as are hereinafter agreed to be paid by the lessee. The lessee covenanted that on or before 30 days after delivery to it of a policy of title insurance showing title as warranted by petitioner-lessor, it would commence drilling operations on "the land hereby leased" and prosecute *35 the drilling with reasonable diligence until petroleum in paying quantities was found or until a depth was attained which made further drilling unprofitable. That within 90 days after the first well was abandoned or became a "paying well", as defined in the indenture, lessee would commence drilling another well, and, under like terms and conditions, would continue the drilling of wells until 16 wells, including offset wells, were "drilled on the premises hereby leased." That lessee would continuously pump and operate each well so long as it produced oil in paying quantities. That it would drill all necessary offset wells. That it would pay all costs and expenses of drilling each well and the operation thereof, keeping an accurate account of all costs and all production. If the first well drilled was a "paying well" the lessee was entitled to retain all "proceeds of sale" from production from said well until all "costs and expenses" theretofore incurred "by it under this lease in drilling such paying well, have been paid in full", and thereafter the lessee "shall pay to the Lessor fifty per cent (50%) of the 'net profits' as hereinafter defined, to the Lessee from said paying well." *36 If the first well was abandoned and the lessee decided not to drill a further well or wells but to quitclaim the property to petitioner, the lessee was to bear all costs and expenses of drilling such well. If the first well was abandoned or was not a "paying well" and lessee drilled a second well, which was a "paying well", lessee was entitled to retain all "proceeds of sale" until it recovered all "costs and expenses" in drilling "such paying well", and thereafter petitioner was entitled to 50 percent of the "net profits", as defined by the agreement. Similar provisions are set forth with respect to the rights of the parties as to subsequent paying wells, and if a well was abandoned or a nonpaying well was drilled after the first well, the lessee was required to pay only 25 percent of the "net profits" to the lessor until such time as all "costs and expenses" incurred in drilling all wells, except the first well, had been recovered from the lessor's remaining 25 percent of said net profits, otherwise payable to the said lessor. The agreement defined a "paying well" as one which produces for a period of 30 consecutive days at least 20 barrels each day of merchantable oil for each *37 500 feet of depth of the well, or which produces at least 1,000,000 cubic feet of merchantable gas per day for 30 consecutive days for each 1,000 feet of depth of the well. "Proceeds of sale," as to oil, were defined as the offering or prevailing current price per barrel of certain oil companies, or the amount actually received by the lessee; as to natural gas, casinghead gasoline or other hydrocarbon substances it was the amount received by lessee less all costs of producing, collecting, saving, extracting and transporting the same. The "costs and expenses" in drilling a well were defined at length in the agreement but may be summarized here as all expenditures for labor, supervision and equipment used in connection with bringing in the well, except equipment not worn out or consumed in the operation, and the cost of all storage, pumping and other facilities for storing, treating, handling, manufacture and/or transportation not charged as cost or expense of drilling the well. "Net profits" were defined as "proceeds of sale" less "costs and expenses", less sums sufficient to meet all state and county taxes, assessments specified therein, less all payments for damages resulting *38 from operations, less cost of maintenance and operation of wells, less all actual costs and expenses of lessee incurred in protecting its rights to produce oil, gas, etc., from the demised premises, less necessary insurance premiums and workmen's compensation charges, less all actual costs of lessee for improvements, equipment, supervision and other proper holding and operating costs, less a reasonable sum for depreciation of equipment temporarily used in connection with production operations and less any general lease expense not specifically covered but properly chargeable to operation of the premises under recognized methods of accounting. If petitioner became dissatisfied with the "proceeds of sale" obtained by the lessee it could require the sale of 50 percent of the products to designated purchasers if not insolvent; but any moneys due the lessee from sales made in accordance with petitioner's instructions if not paid within 15 days after the due date could be deducted by lessee from any moneys due or thereafter to become due the lessor. The lessee was not obligated to produce, save or sell natural gas or casinghead gasoline unless a profitable market for the sale at the site *39 of the wells could be obtained. The lessee was authorized to use petroleum and gas, free of charge, in connection with carrying on its operations and the amount thereof was to be deducted from total production before computing "proceeds of sale" and/or "net profits." The lessee was not to suffer any liens for labor, power, supplies and materials to be maintained. The lessee was to maintain logs of any and all wells drilled upon the land leased and true and correct accounts of production which records were to be available to petitioner for inspection at all reasonable times, and petitioner was entitled to make copies of records showing production. The general provisions of the agreement provide that the lessee shall have "the right at any time or from time to time to surrender this lease as to the whole or any portion of the land hereby demised, and to terminate all of its obligations as to the portion or portions so surrendered without further liability" to the lessor by (a) written notice, (b) payment of 50 cents per acre of land surrendered, (c) delivery and yielding of land surrendered, (d) delivery of quitclaim deed by lessee as to part surrendered. Upon each surrender of land *40 the number of wells lessee was obligated to drill was reduced by one well for each 10 acres surrendered. The lessor was to pay all taxes on all lands surrendered to it. Upon failure of the lessee to drill or prosecute the drilling of a well, within time limit provided, the lessor had the right, after written notice and continued failure for 30 days, to terminate the rights of the lessee and to re-enter the land, whereupon the lessee shall quitclaim its interests to petitioner. Failure of the lessee to perform any other covenant or agreement was not a ground for forfeiture nor did such failure give the lessor a right of re-entry. The lessee retained the right upon "termination of this lease prior to the expiration of the term" whether by abandonment, surrender, forfeiture, re-entry or otherwise, to thereafter retain, pump and operate, re-drill, deepen or otherwise improve any or all wells drilled or drilling, and to possess and occupy land about each well, not exceeding 5 acres, with casements, rights-of-way and other rights necessary to pump and operate and to produce, store, treat, transport, sell or otherwise handle or dispose of the production therefrom, provided the lessee continued *41 to deliver or pay petitioner "the moneys based upon the production from such well or wells as hereinbefore provided." Nothing in the agreement was to be construed to prevent the lessee from drilling as many wells as it desired upon the land, or to obligate the lessee to conduct any drilling or pumping operations (1) except as expressly provided in the agreement, or (2) when prevented by reason of wars, insurrections, riots, earthquakes, fires, accidents, strikes, shortage of water, labor, materials or supplies, or lack of transportation facilities, or statutes, laws, or regulations of the United States, the states, counties, cities or political subdivisions, or (3) when the market value of petroleum of the quality produced from said land shall be less than 50 cents per barrel. Any notice or statement provided for by the instrument was to be in writing and delivery could be made by mailing by registered mail or by personal delivery. The last paragraph of the agreement provides that the terms, conditions, covenants and agreements contained therein "shall be binding upon and inure to the benefit of the * * * assigns and successors in interest of the parties hereto, but no change in *42 ownership of the land hereby leased or assignment of rentals or royalties, shall be binding upon the Lessee until" furnished with an original or duplicate original of transfer or assignment. The lessee was prohibited from assigning "this lease at any time without the written consent of the" lessor. Although the agreement of December 7, 1928, stated the monetary consideration as the nominal sum of $10.00, there was an actual payment to petitioner at the time of the execution of the agreement of $150,000. During 1937, 1938 and 1939 petitioner received from Petroleum Securities Co., or its assignees, payments representing its share of the "net profits", computed in accordance with the agreement of December 7, 1928 in the respective amounts of $520,247.57, $361,409.38 and $287,390.94. Petitioner claimed percentage depletion deductions of 27 1/2 percent in its returns for 1937, 1938 and 1939 upon the foregoing payments in the amounts of $143,068.08, $99,387.58 and $79,032.51, respectively. The gross income from the property resulting from the sale of oil produce therefrom by Petroleum Securities Co. during the years 1937, 1938 and 1939 was $1,193,203.18, $878,038.16 and $671,142.72, *43 respectively. Percentage depletion of 27 1/2 percent of one-half of each of the latter sums is less than 50 percent of petitioner's share of the "net profits" computed in accordance with the agreement of December 7, 1928, which, for the purposes of this proceeding, may be treated as petitioner's share of the net income from the property, if, under the facts herein, petitioner is entitled to deductions for depletion for each of said years. If petitioner is entitled to allowances for depletion for 1937, 1938 and 1939, the amounts thereof, computed in accordance with section 114 (b) (3) of the Revenue Act of 1936, and corresponding provisions of subsequent revenue acts, are in excess of the amounts of such allowances, if computed without reference to said section. Petitioner's returns for 1937, 1938 and 1939 were filed on March 15, 1938, March 15, 1939 and March 13, 1940, respectively. On March 8, 1941, petitioner filed with the collector a claim for refund for 1937 of $3,035.12 based upon its contention that one-half of the gross income from the property, prior to payment of the expenses of operation, was $596,601.59, and petitioner was entitled to percentage depletion thereon instead *44 of percentage depletion on $520,247.57 on which percentage depletion of $143,068.08 was claimed in its income tax return for 1937. Petitioner's income tax liability of $38,826.76, as shown by its 1938 return, was paid as follows: March 15, 1939
$ 9,706.69
June 6, 1939
9,706.69
September 15, 1939
9,706.69
December 15, 1939
9,706.69
Total
$38,826.76
Petitioner's income tax liability of $31,022.75, as shown by its return for 1939, was abated by respondent on July 22, 1940, in the sum of $16.50 and the balance paid by petitioner as follows: March 14, 1940
$ 7,755.69
June 15, 1940
7,755.69
September 4, 1940
7,755.69
December 14, 1940
7,739.18
$31,006.25
Respondent disallowed the depletion deduction claimed by petitioner for each of the taxable years in the amounts hereinabove set forth. This disallowance was the principal and in one year the only adjustment made by respondent in determining the deficiencies herein. The deficiency notice gives the following reason for the disallowance, after referring to the sole and exclusive right and privilege granted Petroleum Securities Co. by the agreement of December 7, 1928: It is held that you effectively disposed *45 of all of your economic interest in the mineral in place in 1928 by the contract referred to: that the amount of the money received by you during the taxable year 1937 from Petroleum Securities Company represented payment for the property rights sold in 1928, and that you are not entitled to the statutory allowance for depletion on such amounts. [Opinion] The principal question submitted is the legal effect of the instrument executed on or about December 7, 1928. Petitioner insists that the instrument is a lease while respondent as earnestly contends that it effected a sale. The parties litigant cite and reply upon substantially the same authorities. The respondent stresses the opinions in ; ; ; ; ; ; , *46 affirmed (C.C.A., 5th Cir.) , certiorari denied, . Petitioner, while finding support for its position in some of the above cited authorities, places its chief reliance upon ; ; ; ; , affirmed (C.C.A., 5th Cir.), ; ; and , certiorari denied, . In comparing this agreement with the agreements referred to in the numerous authorities cited and considered we are impressed by one fact which constantly recurs, namely, that petitioner owned the 160 acres in fee and as owner thereof retained all rights *47 of ownership except those specifically disposed of by the terms of the instrument. It is apparent from the provisions hereinabove summarized that the instrument is, as respondent concedes on brief, "set up in the form of a lease" and "is quite similar to the typical oil and gas lease * * *'. There are no provisions in the agreement of December 7, 1928 which transfer, assign or convey all of petitioner's right, title and interest in the land or the oil, petroleum, natural gas or kindered substances underlying the land as in Petitioner leased and demised the land for 20 years or until commercially profitable production was completed. It granted the lessee alone the right to explore for, discover and produce oil and gas and the rights necessary and incidental to exploration and production, such as the right of entry, the right to drill and the right to develop and use water in connection with operations on the leased and demised property. These rights and all other rights and privileges acquired by the lessee ceased with the expiration or termination of the lease for any cause or from cessation of production. *48 Petitioner's reversionary rights plus its right of forfeiture for lessee's failure to timely drill or prosecute drilling together with the rights of lessor and lessee in fixtures and equipment upon termination of lease, demonstrate that a leasehold estate was intended and not an absolute sale of the property or any interest therein. Respondent relies on the established rule that where the consideration is cash and a share of the profits from the operation of the properties, without the retention of any interest in the oil in place, there is an absolute sale. Helvering v. Elbe Oil Land Development Co.; Helvering v. O'Donnell; Anderson v. Helvering; Blankenship v. United States; and He argues that here the consideration was $150,000 plus a share of the net profits from operation with no retention of any interest in the oil in place. The cited authorities prescribe the rule relied upon by respondent, but the rule is not applicable here, because, in our opinion, petitioner retained an interest in the oil in place. The oil in the ground was a part of the land. The lease gave the lessee the right to explore the land for oil and, if *49 found, to operate on the land for the recovery of oil therefrom. Ownership of the oil in place remained in petitioner as owner of the land and did not pass to the lessee before severance. We believe that the provision for an equal division of the net profits was merely the yardstick adopted by the contracting parties to measure the production acquired by the lessee and the production retained by petitioner as lessor. After payment of "costs and expenses" as defined in the instrument from the "proceeds of sale" as defined in said instrument, the lessee was required to pay the petitioner 50 percent of the "net profit" from each paying well. The lessee was entitled to retain all "proceeds of sale" from production only until all "costs and expenses" incurred in drilling the paying well had been paid in full. We are satisfied that the lessee received the "proceeds of sale" and paid "costs and expenses" not as the sole owner thereof, or as the sole obligor therefor, but as one of two equally interested parties in the production and sale of oil from land furnished by petitioner, and labor, capital, management, and operation furnished by the lessee. Clearly, petitioner retained an interest *50 in the oil produced because it could compel the lessee to sell 50 percent of the production elsewhere if it became dissatisfied with amounts realized by the lessee. The situation here is much like that obtaining in the Gray lease considered in issue 2 of . There, as here, the consideration consisted of cash plus a percentage of the net profits "realized from the operation of the leased premises * * * after deducting all expenses." There, as here, the lessee (or sublessee) acquired exclusive operating rights and the control and management of operations, but was required to commence drilling operations within a stated time and develop the properties or lose its interest. Thus we think that this petitioner, like McLean in the matter of the Gray lease, retained an economic interest in a part of the oil in place and the payments which it was to receive were secured by that interest and were not dependent alone upon the contractural obligation of the lessee. Although the contract covering the Gray leases contained no statement that one-fourth of the net profits involved therein should be made from any portion of the *51 oil, nevertheless, we held that McLean did not sell his interest in the Gray lease, and that the Elbe and Blankenship cases did not apply. For like reasons we hold that this petitioner did not convey all its interest in the oil in the 160 acres, but retained an economic interest in the oil property that is subject to depletion. See Having determined that petitioner is entitled to depletion allowances we have the additional question presented of whether petitioner should compute percentage depletion upon the amount received from the lessee or upon proceeds of sale before reduction by "costs and expenses." Specifically, petitioner asks that its percentage depletion allowance be 27 1/2 percent of $596,601.59, $439,019.08 and $335,571.36 for 1937, 1938 and 1939, respectively, instead of 27 1/2 percent of $520,247.57, $361,409.38 and $287,390.94 for said respective years. A similar question was presented and decided in , with respect to the aforementioned Gray leases. There the petitioner contended for 27 1/2 percent of one-fourth of the gross *52 proceeds from the sale of production. In our opinion we pointed out that the statutory term "gross income from the property" meant the gross income from the property received by the particular taxpayer claiming a deduction for depletion and is synonymous with the amount to be included in the taxpayer's gross income under section 22, , and that the gross income from the property so far as McLean was concerned was the amount the Gulf Refining Co. paid him. By a parity of reasoning the amounts received by petitioner from Petroleum Securities Co., or its assignees, as computed under the agreement of December 7, 1928, represented petitioner's "gross income from the property" and percentage depletion was properly computed thereon. While the disallowances of the depletion deductions represented the principal adjustment made by respondent, there were other adjustments which will necessitate a redetermination of the deficiencies, and accordingly, Decision will be entered under Rule 50.